IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JAMIE L. KING, | ) | CASE NO.: 1:16 CV 2558 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| MANSFIELD CORRECTIONAL | ) | |
| INSTITUTION, *et al.*, | ) | |
| | ) | MEMORANDUM OPINION |
| Defendants. | ) | AND ORDER |
| | ) | |

This matter is before the Court on Defendant's Motions for Summary Judgment. (ECF #30). Plaintiff filed an Opposition to the Motion (ECF #32), Defendant filed a Reply brief in support its motion. (ECF #37). After careful consideration of the issues and a full review of the filings and all relevant authority, Defendant's Motion for Summary Judgment is, hereby, GRANTED in Part and DENIED in part.

## PROCEDURAL HISTORY

Prior to filing her Complaint, Ms. King filed a Charge of Discrimination with the EEOC Complaint, and she received a notice of right to sue in July of 2016. She filed her Complaint in October of 2016, naming the Mansfield Correctional Institution and the Ohio Department of Rehabilitation and Corrections as Defendants. (ECF #1). The Complaint alleges that Ms. King was subject to gender discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.* ("Title VII"), by way of unwelcome sexual harassment and groping/touching by Mr. Ross;[1] unwelcome, offensive, and unsolicited comments of a sexual nature by Lt. Bise; an inadequate response to these behaviors by the Institution; and a hostile work environment created by the Institution's failure to address a general pattern and practice of sexual harassment and inappropriate sexual relationships between supervisors and subordinates at the Institution, as well as retaliatory comments and actions from coworkers. The Complaint also sets forth a claim for retaliation, alleging that because of her complaint against Mr. Ross, Ms. King was denied overtime opportunities; denied a request for shift change; subjected to dangerous conditions because her coworkers intentionally failed to timely respond to "man-down" calls and other requests for assistance; subjected to ridicule, and hostile and/or offensive comments which went unpunished at the Institution.

---

[1] At the time of the alleged harassment, Mr. Ross was a probationary Lt. in the role of shift supervisor. He was later demoted back to being a correction officer. In order to avoid any confusion that may arise from his changing titles, the Court will refer to him throughout simply as "Mr. Ross."

## FACTS [2]

Ms. King began working as a Corrections Officer ("CO") for the Ohio Department of

Rehabilitation and Correction, Mansfield Correctional Institution ("ManCI" or "the Institution) in

August of 2014. ManCI is a mixed-security prison in Mansfield, Ohio, which houses

approximately 2600 inmates, and employs approximately 600 staff members. The Institution has

in effect several policies and procedures governing employee behavior including an Anti-

Discrimination policy, a Sexual Harassment policy, a Response to Workplace Violence policy,

and Standards of Employee Conduct with attendance and disciplinary regulations. There is also

an Incident Reporting and Notification policy. (King Depo. at 43-58; Tobin Decl. at 9). Ms.

King bid on and was assigned to third shift, which ran from 10:00 pm to 6:00 am. She and her

husband both worked at ManCI on the same shift. (King. Depo. at 72-73). Ms. King was

subject to involuntary overtime, and could request overtime, subject to demand and seniority

preferences. (King Depo. at 76-77).

In her Complaint, Ms. King alleges two specific instances of direct sexual discrimination

by co-workers,[3] and alleges that the Institution fostered a general attitude of gender based hostility

---

[2]

In accordance with the applicable standards on a motion for summary judgment, genuine questions of material fact relevant to each motion for summary judgment have been resolved in favor of the non-moving party. The facts are taken from the undisputed portions of the parties' recitation of facts, those facts asserted in the Complaint which are not contradicted by the evidence, and from the uncontested witness statements contained within the deposition transcripts submitted in connection with the summary judgment briefings.

[3]

In her briefing and in her deposition, Ms. King also references a third example of alleged discrimination resulting from her encounters with a Lt. Hamm. Ms. King alleges that Lt. Hamm made inappropriate comments to her on five or six occasions in November of 2014, and rubbed her arm a few times. (King Depo. at 80-86). He would complain about his

and harassment sufficient to create a hostile work environment. The allegations of direct gender discrimination or harassment involved a single encounter with Billy Ross when he was acting as her shift supervisor on December 24, 2014, and a series of what Ms. King deems to be inappropriate comments made to her during an encounter with Lt. Bice.

The incident with Mr. Ross occurred on the overnight shift of December 28-29, 2014. According to Plaintiff, Mr. Ross was assigned as the shift supervisor that night. He asked her to let him into her secured area around 11:00 p.m. (King Depo. at 99). He logged into the log book, but told her not to list him in the computer as being in the area with her. (King Depo. at 100). They began talking and, Plaintiff alleges that he "started talking about places in the institution that he could get a blow job," and that they "could get away with doing that in control center 2 because there was no cameras." (King Depo. at 100-101). She told him she was married and didn't appreciate what he was saying and he responded that it was ok because he had the same name as her husband so she "wouldn't get his name confused." (King Depo. at 101).

---

wife; told her he wished he had a girl like her; and would get in her personal space. (King Depo. at 82-83). When Ms. King complained about his behavior to her supervisor, her supervisor reported the issue to Captain Gilbert, who questioned her about the incidents and told her he would take care of it. (King Depo. at 85). Following Captain Gilbert's intervention, Lt. Hamm never again said or did anything that Ms. King deemed harassing. (King Depo. at 86). Ms. King does not allege that Lt. Hamm's behavior was pervasive, or that it affected her ability to perform her job, and she does not refer to any of these allegations in her Complaint. She also does not allege that the Institution mishandled the situation or otherwise did anything in connection with this incident for which they could be liable. To the contrary, she admits that her superiors took her complaint seriously, addressed it directly with Lt. Hamm, and that their intervention immediately solved the problem. Even if the Institution had not immediately and effectively handled the Ms. King's issues with Lt. Hamm, these incidents were not mentioned in the Complaint and therefore are not part one of the direct harassment claims addressed by this lawsuit. If relevant at all, these interactions might may be considered as part of the general atmosphere or environment that allegedly created a hostile work environment.

Whenever anyone walked by the room, he would turn the lights off to hide from them. He also talked about a list of employees he wanted to sleep with. After a few hours the Captain on the shift called to have Ms. King let him in and Mr. Ross said she "should have told him that [she] couldn't answer the door because I was in there naked with him." (King Depo. at 102). After the Captain left the area, Mr. Ross said he should go because he didn't want anyone to know he was there. He asked her to unlock the doors for him to leave but then told her repeatedly that they did not open and she would have to come over there. When she went to the door and pushed on it, it was open. He laughed and said "I know." At that point he grabbed her, "pushed [her] against the wall, holding [her] there, and he tried to kiss [her]." (King Depo. at 102). She turned so he got only the side of her face. (King Depo. at 102). She pushed him and told him "not to ever f***ing touch [her] again." Before he left he said, "I'll be back." (King Depo. at 103).

The same night he called her twice while still at work saying he could not stop thinking about her and he would see her later. (King Depo. at 103-104). He also emailed several times, once about work, and other times to leave flirty messages such as "hopefully you don't make the freeze list, but at least you top my list," and "so, would I make your list?" (King Depo. at 104-105). Ms. King did not respond to the non-work related comments and emails. (King Depo. at 104). He also called from his car on his way home telling her to have "sweet dreams," that "he couldn't stop thinking about [her]," and that the next night he would try to keep [other officers] out "because he wanted to finish what he started." (King Depo. at 105). The communications made her nervous enough to ask her union officer if someone could come and sit with her for part of her shift, and to ask another officer to walk her out to her car in case Mr. Ross might be waiting for her outside. (King Depo. at 105).

She told her union officer what happened that night before she left, and called Lt. Lisa Booth on her way home to tell her what had happened, as well. (King Depo. at 106-108). When she arrived home she told her husband, and called the Warden's office to let him know. (King Depo. at 109-110). The Deputy Warden told her to file an incident report and asked if she was ok to work that night. Ms. King said she would be fine to work as long as she didn't have to deal with Mr. Ross, and the Deputy Warden said he would put Mr. Ross on a different shift immediately. (King Depo. at 111-112). Mr. Ross was not at the institution the next night when Ms. King went into work. (King. Depo. at 112). When she arrived, both Lt. Booth and Captain Gilbert came to talk with her and had her sign a no-contact order as between her Mr. Ross. (King Depo. at 118, 121). They told her he would now be on second shift, and they took her to the clinic to be checked out. (King Depo. at 118). Ms. King's husband, and Mr. Ross also had no-contact orders. (King Depo. at 121, 128). Mr. Ross was disciplined with a five day suspension and was demoted. (King Depo. at 199-200). They never worked together again, and Mr. Ross never tried to contact her again. (King Depo. at 135, 158). Ms. King indicated she was satisfied with ManCI's immediate handling of the incident, and had no concerns with the investigation of the incident, or the conclusions reached by the ManCI following the investigation. (King Depo. at 132, 141, 144, 152).

In late February, Ms. King sought and obtained an ex parted civil protection order which prevented Mr. Ross from being in the same workplace as Ms. King. She provided it to ManCI, and Mr. Ross was sent home immediately after. (King Depo. At 185-186). Mr. Ross was not allowed back to the institution until after a full hearing on the protection order took place. (King Depo. At 186, 198). Following the full hearing, the order allowed Mr. Ross to come back to

work at the institution, but prevented him from being in the building when Ms. King was there, and required that he be escorted to and from his car every day. (King Depo. At 197). Generally, the order was upheld. There were three instances when Mr. Ross and Ms. King were on site at the same time, however, twice due to mistakes in overtime scheduling that resulted in overlapping shifts. (King Depo. at 158-159). One of those times when Ms. King passed Mr. Ross he called her "a stupid lying bitch." (King Depo. at 159). On May 1st, 2015, Ms. King was informed a few hours into her shift that Mr. Ross was on the grounds. She never saw him, and he had been switched to a post that ensured they would not be around each other, and the Captain on duty asked Ms. King if she was okay working under those circumstances. The alternative was that she would be sent home. She agreed to stay and work, and completed her shift without incident. (King Depo. At 229-232). The Captain told her she needed to file an incident report because a violation of the protective order was a situation that needed to be addressed, and she did so. (King Depo. At 233).

Ms. King complained that she felt she was not being given overtime opportunities because the people who scheduled overtime were friends of Mr. Ross and because Mr. Ross was not allowed to be on the grounds if she was working. Any overtime she was offered, except on her days off would overlap with Mr. Ross' regular schedule because he was scheduled to be at work during parts of both first and second shifts. (King Depo. At 240-242). When overtime opportunities came up, she believed that she should be allowed to take them whether or not they overlapped with Mr. Ross' shifts and, in those cases, he should be sent home to comply with the protective order. (King Depo. At 238-242). She filed incident reports noting that she believed other officers were being offered overtime even though she should have had gotten the offer

based on the union guidelines. (Def. Ex. 44, 45). These allegations were disproved during an ensuing investigation. (Def. Ex. 50, 51). Ms. King admitted that the information leading her to this conclusion was not based on first hand knowledge, and she did not pursue her overtime concerns through the union protocol, however. (King Depo. At 232; Def. Ex. 45, 47).

When she returned to work after the incident report was filed, Ms. King was subject to harassment from co-workers during shift changes. Ms. King claims that people started called her "a snitching-ass bitch," "a liar," and "an inmate f***er." (King Depo. At 187, 192). She says she was spit on by multiple people, had things thrown at her, and had her lunch thrown on the floor and urinated on. (King Depo. At 187-189. 195). She reported some of the incidents to her supervisors and other superiors, who told her file incident reports as required by the Incident Reporting Policy, but she did not file incident reports on each event. (King Depo. At 188-190, 194). A co-worker admitted to her that he had seen a copy of the Ross incident report and had copied it and circulated it among other workers. (King Depo. at 162-165). Ms. King reported this incident to the investigator, and that co-worker was disciplined with a five day suspension. (King Depo. at 165).

Ms. King also testified that she had heard rumors that she was going to be targeted for write ups, and that someone was going to pay inmates to harm her. She has no evidence that any of these rumors were true, and none of the alleged threats ever materialized. (King Depo. At 203-206, 212). She told her supervisors who told her to make official reports of the issue, but she did not file any reports at the time. (King Depo. At 206-208). [4]

---

[4]

She did later include these claims in an incident report filed about her alleged sexual harassment by Lt. Bise.

Following the Ross incident, Ms. King began calling off work when she felt she could not face the name calling and other harassing behaviors she was experiencing at work. The days she called off coincided with her husband's days off. Eventually, in May of 2015, the institution required her to begin submitting physician's verifications for sick time. (King Depo. At 243-244). Around the same time, Ms. King was put on a performance improvement plan. (King Depo. At 244). Following the Ross incident, Ms. King also received her mid-probationary review. (King Depo. at 146). She received good reviews except for a "did not meet standard" on attendance purportedly because she had been sent home sick on two different occasions. Although she admits that she was sick, she says she only went home because her supervisors told her to go. She believes that this was included on her review because the reviewer was a friend of Mr. Ross and wanted to include something negative because she reported Mr. Ross for sexual harassment, but she never reported this suspicion to anyone at the institution. (King Depo. at 146-149). There is no evidence or allegation that this statement on her review had any negative ramification on her employment or employment conditions. (King Depo. at 170).

On or about March 16, 2015, Ms. King was approached by Lt. Bise, a supervisor. He talked to her about his sexual relations with his wife and told her that when he had sex with his wife, he was going to be thinking of her. (Def. Ex. 30). Ms. King filed an incident report about this conversation and the institute promptly issued a no-contact order between Ms. King and Lt. Bice, assigned an investigator, and provided Ms. King with a number for the employee assistance program. Ms. King never worked with Lt. Bice again after that night. (King Depo. At 212). However, she claims that following her reporting of this incident, the investigator told her she needed to stop filing incident reports, was rude, and treated her as if she was not telling the truth.

(King Depo. At 216-217).

Also in March Ms. King reported that she had been told by other corrections officers that some people at the institution were threatening not to help her if she ever issued a "man down" alert. (King Depo. At 222). She believes that one time when she issued a "man down" because the inmates were refusing to return to their cells, a supervisor was intentionally slow to respond. (King Depo. At 222-223). She was told by other correction officers that they saw him check his watch, stop and talk to people, and walk slowly when responding, though she did not witness this herself. (King Depo. At 223-225). She did not file an incident report about this specific incident, but did mention in her report on Lt. Bice that she had been told to watch her back and that other officers may be out to get her. (King Depo. At 226-227; Def. Exhibit 30).

## STANDARD OF REVIEW

Summary judgment is appropriate when the court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden of showing the absence of any such "genuine issue" rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citations omitted). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. The court will view the summary judgment motion in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of their case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322). Accordingly, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (citing *Anderson*, 477 U.S. at 252). Moreover, if the evidence presented is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citations omitted). In most civil cases involving summary judgment, the court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252. However, if the non-moving party faces a heightened burden of proof, such as clear and convincing evidence, it must show that it can produce evidence which, if believed, will meet the higher standard. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

Once the moving party has satisfied its burden of proof, the burden then shifts to the non-mover. The non-moving party may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't of*

*Transp.*, 53 F.3d 146, 149 (6th Cir. 1995). Evidence may be presented by citing to particular

parts of the record, including depositions, documents, electronically stored information, affidavits

or declarations, stipulations (including those made for purposes of the motion only), admissions,

interrogatory answers, or other materials. Fed. R. Civ. P. 56(c). In lieu of presenting evidence,

Fed. R. Civ. P. 56(c) also allows that a party may show that the opposing party's evidence does

"not establish the presence of a genuine dispute" or that the adverse party "cannot produce

admissible evidence to support the fact."

According to Fed. R. Civ. P. 56(e),

[i]f a party fails to properly support an assertion of fact, or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:

(1) give an opportunity to properly support or address the fact;

(2) consider the fact undisputed for purposes of the motion;

(3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or

(4) issue any other appropriate order

Though parties must produce evidence in support of and in opposition to a motion for

summary judgment, not all types of evidence are permissible. The Sixth Circuit has concurred

with the Ninth Circuit that "'it is well settled that only admissible evidence may be considered by

the trial court in ruling on a motion for summary judgment.'" *Wiley v. United States*, 20 F.3d

222, 225-26 (6th Cir. 1994) (quoting *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181

(9th Cir. 1988)). Federal Rule of Civil Procedure 56(e) also has certain, more specific

requirements:

[Rule 56(e)] requires that affidavits used for summary judgment purposes be made

> on the basis of personal knowledge, set forth admissible evidence, and show that the affiant is competent to testify. Rule 56(e) further requires the party to attach sworn or certified copies to all documents referred to in the affidavit. Furthermore, hearsay evidence cannot be considered on a motion for summary judgment.

*Wiley*, 20 F.3d at 225-26 (citations omitted). However, evidence not meeting this standard may be considered by the district court unless the opposing party affirmatively raises the issue of the defect. If the opposing party:

> fails to object before the district court to the affidavits or evidentiary materials submitted by the other party in support of its position on summary judgment, any objections to the district court's consideration of such materials are deemed to have been waived, and [the Sixth Circuit] will review such objections only to avoid a gross miscarriage of justice.

> *Id.* at 226 (citations omitted).

As a general matter, the district judge considering a motion for summary judgment is to examine "[o]nly disputes over facts that might affect the outcome of the suit under governing law." *Anderson*, 477 U.S. at 248. The court will not consider non-material facts, nor will it weigh material evidence to determine the truth of the matter. *Id.* at 249. The judge's sole function is to determine whether there is a genuine factual issue for trial; this does not exist unless "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*

In sum, proper summary judgment analysis entails "the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

## ANALYSIS

Gender discrimination and retaliation claims can be established in one of two ways, either by direct evidence of discrimination or by the burden shifting framework established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-803 (1973). In the absence of direct evidence, a Plaintiff may establish a *prima facie* case of discrimination or retaliation through circumstantial evidence. *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 584 (6th Cir. 2009). If a *prima facie* case of discrimination or retaliation is established, the burden then shifts to the Defendants to articulate a "legitimate, non-discriminatory reason" for the employer's decisions. *McDonnel Douglas Corp.*, 411 U.S. at 802. If the Defendant is able to articulate such a reason, the burden shifts back to the Plaintiff to prove by a preponderance of the evidence that the Defendant's explanation is pretextual. *Id* at 803-804. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated or retaliated against the plaintiff remains at all times with the plaintiff." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

I. Sexual Harassment/Gender Based Hostile Work Environment

In order to prove the existence of a hostile work environment on the basis gender, Ms. King is required to show that: (1) she is a member of a protected class; (2) she was subjected to harassment, either through words or actions, based on her gender; (3) the harassment had the effect of unreasonably interfering with her work performance and creating an objectively intimidating hostile or offensive work environment; and, (4) there exists some basis for liability on the part of the employer. *Grace v. USCAR*, 521 F.3d 655, 678 (6th Cir. 2008). The standards

for liability differ depending on whether the alleged harassment is perpetrated by a co-worker, or by a supervisor. *Newton v. Ohio Dept' of Rehab. & Correction – Toledo Corr. Inst.*, 496 Fed. Appx. 558, 563 (6ᵗʰ Cir. 2012). If the harassment is coming from a supervisor, an employer is vicariously liable for the creation of a hostile work environment. *Id. See also, Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). A "supervisor," for these purposes, is "an individual who serves in a supervisory position and exercises significant control over plaintiff's hiring, firing or conditions of employment." *Id.* If the harassment is coming from a co-worker, then the "employer is liable if it knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action." *Newton*, 496 Fed. Appx. At 563.

a) The Ross Incident

At the time of the incident, Mr. Ross was a probationary lieutenant, acting as a shift supervisor, and he had no authority to effect changes on any correction officer's employment status or terms of employment. (Tobin Decl. ¶ 11, ECF #30-4).   Plaintiff does not contest this fact, and though she does not explicitly concede that Mr. Ross should be categorized as a co-worker, she agrees that, in order to recover, she must prove that ManCI "knew or should have known of the harassment and failed to take immediate and appropriate corrective action." (ECF #32 at 19).  Thus, the parties agree that, in this instance, the Court should apply the legal standard applicable when the alleged harassment comes from a co-worker.

Defendants do not dispute that Mr. Ross harassed Ms. King based on her gender, or that she is a member of a protected class.  They make an attempt to argue that the harassment was not severe or pervasive enough to unreasonably interfere with her work performance or to create an objectively intimidating hostile or offensive work environment, and that there exists no basis for

-15-

liability on the part of the employer. There is no question that Ms. King has presented sufficient evidence to create a genuine issue of material fact as to whether Mr. Ross' harassment was both subjectively and objectively offensive enough to create an intimidating hostile or offensive work environment. She has presented evidence to support her contention that the harassment she suffered at Mr. Ross' hands was severe, physically threatening, and humiliating, and that it went far beyond an "offensive utterance, " teasing or other sporadic incidence of incivility or abusive language. *See, Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 560-561 (6th Cir. 1999). The question then becomes, is there sufficient basis to impose liability against ManCI for Mr. Ross' alleged actions.

As stated above, ManCI is liable for Mr. Ross' harassing behavior if it "knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action." *Newton*, 496 Fed. Appx. At 563. There is no dispute that Ms. King promptly notified the institution after the incident of harassment occurred. There is also no dispute that ManCI immediately took action on the allegation. Immediately upon receiving notice of the incident, the Deputy Warden told her to file an incident report and put Mr. Ross on a different shift immediately. (King Depo. at 111-112). Both Lt. Booth and Captain Gilbert came to talk with her and had her sign a no-contact order as between her Mr. Ross. (King Depo. at 118, 121). They told her he would now be on second shift, so that they would not have to see each other, and they took her to the clinic to be checked out. (King Depo. at 118). Ms. King's husband, and Mr. Ross also had no-contact orders. (King Depo. at 121, 128). Mr. Ross was disciplined with a five day suspension and was demoted. (King Depo. at 199-200). They never worked together again,

and Mr. Ross never tried to contact her again. (King Depo. at 135, 158). Ms. King indicated she was satisfied with ManCI's immediate handling of the incident, and had no concerns with the investigation of the incident, or the conclusions reached by the ManCI following the investigation. (King Depo. at 132, 141, 144, 152).

Almost two months later, Ms. King sought and obtained an ex parte civil protection order which prevented Mr. Ross from being in the same workplace as Ms. King. She provided the order to ManCI, and Mr. Ross was sent home immediately. (King Depo. At 185-186). Mr. Ross was not allowed back to the institution until after a full hearing on the protection order took place. (King Depo. At 186, 198). Following the full hearing, the order was amended to allow Mr. Ross to come back to work at the institution, as long as he was not in the building when Ms. King was there. The Order also required that he be escorted to and from his car every day. (King Depo. At 197). ManCI cooperated in enforcing the order. There is absolutely no evidence to suggest that ManCI failed to take prompt and appropriate action to address the incident and to prevent future instances of harassment by Mr. Ross.

Ms. King contends that ManCI's response was not adequate, in large part because there were three instances, following the issuance of the Order, when Mr. Ross and Ms. King were on site at the same time. These instances were due to mistakes and miscommunications, were quickly corrected, and never resulted in any interaction between Mr. Ross and Ms. King. (King Depo. at 158-159). When an employer takes action to address known sexual harassment, it can only be liable if "its response manifests indifference or unreasonableness in light of the facts the employer knew or should have known." *Hawkins v. Anheuser-Busch. Inc.*, 517 F.3d 321, 338 (6th Cir. 2008). Ms. King has offered no evidence to suggest that ManCI's response to her complaint

manifested indifference or unreasonableness. Further, an employer's response is generally considered adequate "if it is reasonably calculated to end the harassment." *Id.* at 338. ManCI took action calculated to ensure that she would not have to work with, nor even encounter, Mr. Ross at work in the future, and those actions were successful. She admits that she never had to work with him again; he never tried to contact her again; and, that ManCI's investigation, conclusions, and handling of the event were appropriate. She has, therefore, failed to present sufficient evidence to support her claim against ManCI for the harassment perpetrated by Mr. Ross.

### b) The Bice Incident

For the same reasons that applied to Mr. Ross, Mr. Bice, as a probationary Lieutenant, is to be considered a co-worker and not a supervisor for purposes of determining ManCI's liability for his alleged harassment of Ms. King. As with Mr. Ross, Defendants do not dispute that Mr. Bice harassed Ms. King based on her gender, or that she is a member of a protected class. They do, however, argue that the harassment was not severe or pervasive enough to unreasonably interfere with her work performance or to create an objectively intimidating hostile or offensive work environment, and that there exists no basis for liability on the part of the employer.

In the case of Mr. Bice, Ms. King complained of a single incident when he talked to her about his sexual relations with his wife and told her that when he had sex with his wife, he was going to be thinking of her. (Def. Ex. 30). There is no allegation of physical contact. Ms. King filed an incident report about this conversation and the institute promptly issued a no-contact order between Ms. King and Lt. Bice, assigned an investigator, and provided Ms. King with a number for the employee assistance program. Ms. King never worked with Lt. Bice again after

-18-

that night. (King Depo. At 212).

Even if this encounter, when coupled with her experiences with Mr. Ross and Mr. Hamm,[5] could be considered sufficiently severe or pervasive to constitute a violation of Title VII, the evidence shows that ManCI took immediate action to address the issue and prevent future contact between Ms. King and Mr. Bice. This corrective action was calculated to end the harassment, and, indeed, was effective in that regard. Ms. King admits that she never worked with Mr. Bice again after she filed her complaint. (King Depo. at 212). Ms. King has offered no evidence to suggest that ManCI's response to her complaint manifested indifference or unreasonableness, or that it did not appropriately and effectively address the problem. She has, therefore, failed to establish that there is sufficient evidence to support her claim against ManCI for the harassment perpetrated by Mr. Bice.

II. Official Retaliation

Section 2000e-3(a) of Title VII of the United States Code prohibits retaliation against an employee "because [she] has opposed any practice made an unlawful employment practice… or because [she] has made a charge, testified, assisted, or participated in any manner in an

_____

[5]

As set forth in more detail above, the encounter with Lt. Hamm was not included in Ms. King's Complaint. Further, unlike with the other two incidents, there is no allegation that Lt. Hamm said anything overtly sexual to Ms. King or made any sexual advances toward her. She alleges that Lt. Hamm made inappropriate comments by complaining about his wife; told her he wished he had a girl like her; and would get in her personal space. (King Depo. at 82-83). Even if this behavior could be viewed as sexual harassment, ManCI took immediate action as soon as Ms. King complained about the encounter. Without even waiting for requiring her to file a formal incident report, a supervisor confronted Lt. Hamm about the behavior, and Ms. King never had an issue with him again.

investigation, proceeding, or hearing under this subchapter." To establish a *prima facie* case of retaliation a plaintiff must show that: (1) she engaged in protected activity; (2) her exercise of her civil rights was known by the defendants; (3) the defendants thereafter took an employment action that was materially adverse to her; and, (4) there was a causal connection between the protected activity and the adverse employment action. *See, Burlington v. Northern & Sante Fe Railroad Co. v. White*, 548 U.S. 53, 67-70 (2006); *Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003). The parties both accept that Ms. King engaged in protected activity, that was known by the Defendant when she reported being sexually harassed. Plaintiff claims that she was then subjected to materially adverse employment actions by way of denial of overtime opportunities, denial of shift preferences, and constructive discharge.

Lost overtime opportunities can amount to an adverse employment action when the lost opportunities were "both relatively regular in their occurrence and significant in their monetary impact." *Gates-Lacy v. Cleveland Dep't of Pub. Safety*, Case No. 1:09CV2593, 2011 U.S. Dist. Lexis 105791 at 15-16, fn 2. (N.D. Ohio Sept. 19 2011). Ms. King made two formal complaints about denial of overtime, and has asserted that she has been subject to other lost opportunities because any overtime shift she could work would overlap with Mr. Ross' schedule and conflict with the terms of the Civil Protection Order in place to separate the two. Although ManCI investigated the two formal complaints and found them to be unsubstantiated, this Court is not bound by those investigative findings. At best, they create an issue of fact as to whether Ms. King was entitled to the overtime sought without regard to the implementation of the Civil Protection Order. The Defendants have not produced any evidence that would categorically disprove Ms. King's assertion that she was being denied overtime opportunities as a result of the

correction action put in place following her reporting of Mr. Ross' harassment. She, on the other hand, has provided at least some evidence that would allow a jury to infer that the lack of overtime opportunity was to be a relatively regular occurrence, and that it would have a significant monetary impact on her. The direct retaliation claim based on lost overtime opportunity, therefore, cannot be determined without a trial.

In contrast, neither party has presented any legal support for the idea that the denial of a shift bid equates to a materially adverse employment action. Ms. King had originally asked to be placed on third shift. She was allowed to remain on third shift following the incident, while Mr. Ross was required to change his usual shift to avoid overlap. When Ms. King later sought to switch to second shift, that request was denied because it would place her and Mr. Ross in the facility during the same times, in violation of the Civil Protection Order she had requested. The denial did not affect her duties and responsibilities, nor did it affect her pay, her promotion schedule, or any other material benefits of the job. The denial of her shift change request, therefore, cannot be the basis for a claim of retaliation against ManCI.

The facts Plaintiff has alleged in support of her claim that ManCI created a hostile work environment that led to her constructive discharge are conflated with her claim that she suffered a hostile work environment due to co-worker harassment and retaliation. She points to no specific actions by management or by the institution itself, aside from the alleged denial of overtime opportunities that could support a claim of direct retaliation. The only event she cites, aside from her treatment by co-workers, which will be addressed separately below, is when Warden Lazaoff allegedly told her that "if she could not work with Ross in the prison she should find another job." (ECF #32 at 29). This comment was not given as an ultimatum to Ms. King, rather, in response

to her indication that she thought Mr. Ross should be fired or transferred from ManCI. The Warden had already ensured that Mr. Ross would not be working with Ms. King, nor even working in the building at the same time as Ms. King. Her insistence that she could not bear to come to work because she saw Mr. Ross in passing, one time, when a scheduling mis-communication caused a temporary violation of the protective order, even though she did not have to work with him or interact with him in any way, led the Warden to make this statement. ManCI's refusal to fire or transfer Mr. Ross, when other corrective action had been taken to address the type of harassment at issue in this case and prevent any future opportunity for such encounters, is not, as a matter of law, sufficient to create conditions so intolerable that a reasonable person would have felt compelled to resign.[6]

III. Co-worker Retaliation

In order to establish a prima facie case against an employer for co-worker retaliation, an employee must establish that (1) the co-worker's retaliatory conduct is sufficiently severe so as to dissuade a reasonable worker from making or supporting a charge of discrimination; (2) supervisors or members of management have actual or constructive knowledge of the co-worker's retaliatory behavior; and, (3) supervisors or members of management have condoned, tolerated,

---

[6]

The Complaint outlines other actions taken against Ms. King including the institution of a performance plan/leave restrictions and a comment on her review relating to missed time at work. None of these actions are addressed in her brief in opposition to summary judgment. We will, therefore, treat these as abandoned issues. In any event, none would rise to the level of an adverse employment action. Further, Defendant has provided non-retaliatory justifications for each action, and Plaintiff has made no attempt to show that these justifications amount to pretext.

or encouraged the acts of retaliation, or have responded to the plaintiff's complaints so inadequately that the response manifests indifference or unreasonableness under the circumstances. *Hawkens*, 517 F.3d at 347; *Burlington N. & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006).

Ms. King has presented sufficient evidence to create a material issue of fact as to whether the treatment she received from her co-workers after having reported Mr. Ross' harassment was sufficiently severe so as to dissuade a reasonable worker from making a charge of discrimination. Being taunted, cursed at, spit upon, and suffering other potentially humiliating and dangerous acts of alleged retribution could certainly be found by a jury to be sufficiently severe to satisfy the first prong of her claim. There is also ample evidence that she reported these events to her supervisors or other members of management at the institution. Finally, Ms. King has presented at least some evidence that could be construed as showing an actionable degree of indifference or unreasonableness in the way management addressed these alleged acts of retaliation and harassment. She has testified that ManCI did not take these allegations seriously, did not follow up or do anything to curb the behavior, and that certain managers told her to stop filing complaints, and treated her as if she were lying. Defendant contends that it always told her to file incident reports when she complained of harassment and retaliation; that it fully investigated every report she filed; and, that it acted on those that had merit. There is, then, a genuine issue of material dispute as to the facts underlying this claim, which cannot be resolved without trial.

## CONCLUSION

For the reasons set forth above, the Defendant's Motion for Summary Judgment (ECF #30) is hereby GRANTED in part and DENIED in part. Defendant is entitled to summary judgment on Count One of the Complaint (Title VII sex discrimination). Plaintiff's claims for co-worker retaliation and for direct retaliation, contained in Count II of the Complaint, shall proceed to trial. The direct retaliation claim shall be limited to the claim based on the alleged adverse action of lost or limited overtime opportunities. Trial remains set for April 29, 2019 at 8:30 a.m. IT IS SO ORDERED.

Judge Donald C. Nugent
United States District Judge

Date: February 7, 2019